1

2

3

4

5
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7
BRIDGETT FISHER; CAROLYN
SABIN; KATRINA ROY; and
BRIGITTE NORTON,

8

9
Plaintiffs,                          C22-5991 TSZ

v.                                   ORDER

10
DEPARTMENT OF FINANCIAL
INSTITUTIONS,

11

12
Defendant.

13       THIS MATTER comes before the Court on a motion for summary judgment,

14 docket no. 37, brought by Defendant Department of Financial Institutions ("DFI").

15 Having reviewed all papers filed in support of, and in opposition to, the motion, the Court

16 enters the following order.

17 **Background**

18       On February 29, 2020, Washington Governor Jay Inslee issued Proclamation 20-

19 05, declaring a state of emergency for all counties throughout Washington State as a

20 result of the coronavirus disease ("COVID-19") outbreak in the United States and the

21 confirmed person-to-person spread of COVID-19 in Washington State.  Ex. E to Lynch

22 Decl. (docket no. 44-5 at 1–3).  On August 9, 2021, Governor Inslee issued Proclamation

23

ORDER - 1

21-14.  Lynch Decl. at ¶ 23 (docket no. 44).  A second iteration identified as

Proclamation 21-14.1 was issued on August 20, 2021.  Proclamation 21-14.1, Ex. O to

Lynch Decl. (docket no. 44-15).  Proclamation 21-14.1 required, with certain exceptions,

all employees of designated state agencies to be fully vaccinated against COVID-19 on or

before October 18, 2021.  Id. at 4–7.  Among the exemptions set forth in Proclamation

21-14.1 was a religious accommodation, which applied if the vaccine requirement would

conflict with state agency workers' "sincerely held religious beliefs, practice, or

observance."  Id. at 5.

Following the issuance of Proclamation 21-14, all DFI employees received an

email from the Governor's office notifying them that they would be required to comply

with the Proclamation.  Davis Decl. at ¶ 7 (docket no. 39).  In August 2021, DFI

developed forms for employees to submit requests for medical and religious exemptions

to the vaccination requirement.  Id. at ¶ 8.  DFI Human Resources ("HR") Director Gerri

Davis and DFI HR Consultant Kaylene Wright established a "Vaccination Exemption

Review Team" (the "Team") to examine submitted exemption request forms to determine

whether they provided sufficient information to support a medical disability or religious

objection to vaccination.  Id. at ¶¶ 1–2 & 9.  The Team did not scrutinize the claimed

religious beliefs of employees who submitted religious exemption requests and moved all

of them to the interactive accommodation process.[1]  Id. at ¶ 10.  Based on guidance from

---

[1] DFI's subsequent letters explaining its denial of Plaintiffs' religious exemption requests contained the following sentence: "We have determined your request for a religious exemption is based on a sincerely held religious belief and that it prevents you from being vaccinated against COVID-19."  See e.g., Ex. E to Franklin Decl. (docket no. 55 at 80).  DFI's determination is not binding on this Court.  See

ORDER - 2

1   the Centers for Disease Control, the Washington Department of Health, and the

2   Washington Department of Labor & Industries, the Team determined that mitigations

3   such as masking, COVID-19 testing, and physical distancing were insufficient to allow

4   an unvaccinated person to work in proximity to others without posing an "untenable

5   health and safety risk."  Id. at ¶ 11.  Accordingly, DFI permitted employees to remain in

6   their role unvaccinated only if they could carry out the essential functions of their role

7   remotely.  Id. at ¶ 12.

8        Plaintiffs Bridgett Fisher, Carolyn Sabin, Katrina Crews (née Roy)[2], and Brigitte

9   Norton (collectively, "Plaintiffs") were DFI employees at the time of Proclamation 21-

10  14.  Davis Decl. at ¶¶ 15, 23, 34, & 39 (docket no. 39).  Plaintiffs submitted religious

11  exemption request forms and DFI denied all four of them.  Ex. 2 to 2d Am. Compl.

12  (docket no. 28-2).  Plaintiffs did not submit proof that they were or would be fully

13  vaccinated against COVID-19 as of October 18, 2021, and DFI subsequently terminated

14  their employment.  See Ex. 3 to 2d Am. Compl. (docket no. 28-3).

15       On December 20, 2022, Plaintiffs filed this lawsuit against DFI.  Compl. (docket

16  no. 1).  In May 2023, Plaintiffs amended their pleading.  Am. Compl. (docket no. 10).

17  After the Court entered an Order, docket no. 26, granting in part and denying in part

18  DFI's motion to dismiss Plaintiff's Amended Complaint, Plaintiffs filed a Second

19

20  Bartholomew v. Washington, 725 F. Supp. 3d 1225, 1232 (W.D. Wash. 2024) ("Although DSHS
21  ultimately found Bartholomew held a religious belief preventing him from complying with the vaccine
    requirement, that determination does not bind this Court's analysis.").

22  [2] Katrina Crews's name before her marriage was Katrina Roy, and she appears in the record under that
    name.  See Mot. for Summ. J. at 5 n.1 (docket no. 37 at 14); Crews Decl. at 1 (docket no. 53).  To avoid
23  any confusion, only her current name, "Katrina Crews" or "Crews," will be used in this Order.

1  Amended Complaint, docket no. 28.  With respect to the claims set forth in the Second

2  Amended Complaint, DFI now seeks summary judgment in its favor against all Plaintiffs.

3  **Discussion**

4  **A.**   **Summary Judgment Standard**

5       The Court shall grant summary judgment if no genuine issue of material fact exists

6  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

7  The moving party bears the initial burden of demonstrating the absence of a genuine issue

8  of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if

9  it might affect the outcome of the suit under the governing law.  Anderson v. Liberty

10  Lobby, Inc., 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the

11  adverse party must present affirmative evidence, which "is to be believed" and from

12  which all "justifiable inferences" are to be favorably drawn.  Id. at 255, 257.  When the

13  record, however, taken as a whole, could not lead a rational trier of fact to find for the

14  non-moving party, summary judgment is warranted.  See Beard v. Banks, 548 U.S. 521,

15  529 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time

16  for discovery and upon motion, against a party who fails to make a showing sufficient to

17  establish the existence of an element essential to that party's case, and on which that

18  party will bear the burden of proof at trial.'" (quoting Celotex, 477 U.S. at 322)).

19  **B.**   **Plaintiffs' Title VII and WLAD Claims**

20       Plaintiffs allege religious discrimination under both Title VII of the Civil Rights

21  Act of 1964 ("Title VII") and the Washington Law Against Discrimination ("WLAD").

22  See generally 2d Am. Compl. (docket no. 28).  Under Title VII, a plaintiff may assert a

23

1   claim for religious discrimination based on theories including disparate treatment and

2   failure to accommodate religious observances or practices.  See Peterson v. Hewlett-

3   Packard Co., 358 F.3d 599, 603 (9th Cir. 2004).  Plaintiffs' claims rely on only the theory

4   of failure to accommodate.  2d Am. Compl. at ¶¶ 30–45 (docket no. 28).  The

5   requirements to state a religious discrimination claim under the WLAD closely mirror

6   those under Title VII.  See Kumar v. Gate Gourmet Inc., 180 Wn.2d 481, 496 (2014).

7   Accordingly, the Court will analyze Plaintiffs' Title VII and WLAD religious

8   discrimination claim concurrently.

9       To establish a prima facie case of failure to accommodate, Plaintiffs must show

10  that "(1) [they] had a bona fide religious belief, the practice of which conflicts with an

11  employment duty; (2) [they] informed [their] employer of the belief and conflict; and (3)

12  the employer discharged, threatened, or otherwise subjected [them] to an adverse

13  employment action because of [their] inability to fulfill the job requirement."  See

14  Peterson, 358 F.3d at 606; see also Feds for Freedom v. Austin, 2024 WL 2922804, at

15  *11 (W.D. Wash. June 10, 2024); Petersen v. Snohomish Reg'l Fire & Rescue, 2024 WL

16  278973, at *5 (W.D. Wash. Jan. 25, 2024) (noting that courts use a burden-shifting

17  framework to analyze failure-to-accommodate-religious-belief claims under both

18  Title VII and the WLAD).  The Court agrees with DFI that Plaintiffs have failed to

19  present a prima facie case because they have not shown that they had the requisite bona

20  fide religious belief.

21      Title VII does not protect secular preferences.  Tiano v. Dillard Dep't Stores, Inc.,

22  139 F.3d 679, 682 (9th Cir. 1998); Doe v. San Diego Unified Sch. Dist., 19 F.4th 1173,

23

1   1180 (9th Cir. 2021) ("[A]lthough Title VII prohibits employment discrimination based

2   on religion, an employee's request for an exemption from a COVID-19 vaccination

3   mandate can be denied on the ground that the employee's belief is not truly religious in

4   nature or is not sincerely held.").  A religious belief need not, however, be consistent,

5   rational, acceptable, logical, or comprehensible to be protected under Title VII.  Keene v.

6   City & Cnty. of San Francisco, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023).

7   Moreover, when a Title VII plaintiff possesses both secular and religious reasons for

8   seeking an accommodation, the secular views do not "cancel out" the religious concerns,

9   so long as the religious belief is "sincerely held."  See Moore v. Effectual Inc., 2024 WL

10  1091689, at *8 (W.D. Wash. Mar. 13, 2024) (citing Callahan v. Woods, 658 F.2d 679,

11  684 (9th Cir. 1981)).

12      With respect to COVID-19 vaccination mandates, district courts within the Ninth

13  Circuit have generally rejected allegedly theological objections as not being based on or

14  related to bona fide and sincerely held religious beliefs.  For example, in Medrano v.

15  Kaiser Permanente, 2024 WL 3383704 (C.D. Cal. July 10, 2024), the plaintiff refused the

16  COVID-19 vaccine for the following reasons: (1) fear of bodily safety, (2) her body is a

17  temple which the vaccine would wrongfully alter, (3) she is guided by the Holy Spirit and

18  does not feel peaceful when it comes to the vaccine, and (4) her opposition to abortion

19  and the vaccine's derivation from fetal cells.  Id. at *3–5.  The court rejected the first

20  objection as not being religious.  Id. at *3.  As to the second, the court stated the plaintiff

21  failed to cite any specific religious belief that prohibits the plaintiff from changing the

22  way God created her and the plaintiff could not elevate her personal medical judgments

23

to the level of religious significance by couching her objections in religious language.  Id. As to the third, the Medrano court noted that several district courts have held that employers are not obligated to approve exemption requests whenever employees assert that their refusal stems from a divine directive; such beliefs amount to "blanket privileges" that do not qualify as a bona fide religious belief.  Id. at *4 (collecting cases). Rather than asserting that the Holy Spirit or God directed her to refuse the vaccine, the plaintiff claimed that the vaccine does not give her peace and thus she must refuse it.  Id. The court held that such allegation does not entail a bona fide religious belief.  Id. Finally, as to the objection related to abortion, the Medrano court noted that, when courts have found a bona fide religious belief, plaintiffs in their religious exemption requests had articulated the connection between their opposition to abortion and the specific religious doctrine that prohibited them from receiving a vaccine potentially produced through the use of fetal cell lines.  Id. at *5 (collecting cases).  The Medrano plaintiff failed to do so, and her failure-to-accommodate claim was dismissed.  Id. at *1 & 4–5.

Similarly, in Ledezma v. Optum Services, Inc., 2025 WL 327743 (N.D. Cal. Jan. 29, 2025), the court granted the defendant's motion for summary judgment and dismissed the plaintiff's failure to accommodate claim.  Id. at *1.  The plaintiff believed that her "body is a temple of the Holy Spirit and [she] has to take care of it."  Id.  The source of this belief was her reading of the Bible and the way she interpreted the Bible.  Id.  The plaintiff believed that because the COVID-19 vaccine is harmful and a foreign substance, taking it would violate those beliefs.  Id.  The Ledezma court held that this evidence was insufficient to establish a genuine issue of material fact on whether the plaintiff's belief

ORDER - 7

as to the vaccine was religious in nature. <u>Id.</u> The <u>Ledezma</u> plaintiff cited no evidence

that her belief about the vaccine is itself religious. <u>Id.</u> Additionally, the plaintiff's

interpretation of the Bible to grant her full authority to decide what she should and should

not do to her body "is the type of 'blanket privilege' that does not suffice as a bona fide

religious belief." <u>Id.</u>; <u>see also</u> <u>Kather v. Asante Health Sys.</u>, 2023 WL 4865533, at *5 (D.

Or. July 28, 2023) ("[V]ague expressions of sincerely held Christian beliefs alone cannot

serve as a blanket excuse for avoiding all unwanted employment obligations.").

In <u>Bartholomew v. Washington</u>, 725 F. Supp. 3d 1225 (W.D. Wash. 2024), the

court also granted the defendant's motion to dismiss, holding that the plaintiff failed to

establish a prima facie claim of failure to accommodate under Title VII and the WLAD.

<u>Id.</u> at 1233–35. To state a claim for Title VII religious discrimination, sufficient

information about the nature of the employee's beliefs must be provided. <u>Id.</u> at 1232.

The <u>Bartholomew</u> court observed that the plaintiff's religious exemption request "like

many other religious exemption requests," based its objection on the vaccine's history

and use of fetal cell lines for research and development. <u>Id.</u> If the plaintiff's objection

was based on the use of fetal cell lines, "he would not have received other vaccinations"

or explained how vaccinations he did receive were not developed using fetal cell lines or

were somehow different from the COVID-19 vaccine in that regard. <u>Id.</u> at 1233. Instead,

when prompted to explain why he received some vaccines and not others, he focused on

his belief in his own "natural immunity." <u>Id.</u> The <u>Bartholomew</u> court rejected this

explanation, noting that courts have been reluctant to recognize analogous "natural

immunity" beliefs as religious rather than secular. <u>Id.</u> at 1233–34 (collecting cases).

Likewise, in Jones v. City of Seattle, 2024 WL 3226748 (W.D. Wash. June 28, 2024), the court held that the plaintiff failed to establish a prima facie case of failure to accommodate and granted summary judgment to the defendant. Id. at *5 & 10. The plaintiff explained that her religious beliefs include her knowledge of her natural immunity and asserted that the COVID-19 vaccine contains fetal cell lines derived from elective abortions. Id. at *4. The plaintiff further stated that the thought of injecting herself with the vaccine caused her great discomfort and that her faith would not allow her to participate in the murder of unborn children. Id. The Jones court noted that this was insufficient to establish a bona fide religious belief, because "she fails to establish what exactly her belief system is." Id. at *5. The plaintiff explained that her religious beliefs include the knowledge of natural immunity and "not being inoculated with fetal derived cells." Id. The Jones court rejected both explanations for the same reasons stated in Bartholomew. See id. The plaintiff had failed to provide further context as to the fetal-derived-cells explanation, which the court read as a conclusory assertion of a violation of religious belief that the court need not take at face value. Id. (citing Bolden-Hardge v. Off. of Cal. State Controller, 63 F.4th 1215, 1223 (9th Cir. 2023)). The Jones court also noted that "discrimination law 'does not protect medical, economic, political, or social preferences.'" Id. (quoting Kather, 2023 WL 4865533, at * 3).

Finally, as in the other decisions, the Moore v. Effectual Inc. court granted summary judgment to the defendant and dismissed plaintiff's failure to accommodate claims. 2024 WL 1091689, at *1 (W.D. Wash. Mar. 13, 2024). Taking the plaintiff's deposition testimony and affidavit at face value, the Moore court stated that the sincerity

of the plaintiff's religious beliefs preventing him from getting the COVID-19 vaccination was "suspect." Id. at *9. Despite having several conversations with his former employer to provide them with an explanation of his religious exemption request, the plaintiff failed to mention his religious objections at all. Id. Other than a "back-dated, co-authored letter," no evidence had been presented of plaintiff asserting or explaining his religious beliefs or how sincerely he held them. Id. Additionally, the plaintiff quite clearly had scientific and political objections to the vaccine that he attempted to fit to his religious beliefs in order to potentially qualify for a religious exemption. Id. The plaintiff testified his objections centered on his belief that the COVID-19 vaccine is potentially harmful, ineffective, and recommended by politicians he distrusts, rather than on any religious belief. Id. Accordingly, the Moore court concluded that the plaintiff failed to establish a prima facie failure to accommodate claim. Id. at *10.

        With the decisions in Medrano, Ledezma, Bartholomew, Jones, and Moore in mind, the Court turns to Plaintiffs' claims. Discussing Plaintiffs seriatim, in alphabetical order (i.e., Crews, Fisher, Norton, and Sabin), the Court concludes, as a matter of law, that no bona fide, sincerely held religious belief for objecting to the COVID-19 vaccine has been established.

### 1.    **Plaintiff Katrina Crews's Claims**

        In July 2021, Crews told her coworkers that she was pregnant. Crews Dep. at 92:14–16, Ex. C to Rogers Decl. (docket no. 38-3 at 41). By August 2021, Crews was about 26 weeks into her pregnancy. Id. at 90:9–12. Crews first requested a medical exemption to the vaccination requirement. Id. at 90:15–21. The basis for the request was

1  that she "was high-risk pregnancy already" and "always had reaction to the flu shot, so I

2  was hesitant." Id.

3        On August 9, 2021, Crews emailed Davis after receiving Governor Inslee's email

4  announcing the vaccine mandate. Ex. C to Davis Decl. (docket no. 39-3 at 13). Crews

5  stated that "I am not vaccinated, as I am in a high-risk pregnancy and am curious as to

6  what [the vaccination mandate] now means for me." Id. Crews did not mention her

7  religion in the email or that she had a religious objection to the vaccine. See id.; Crews

8  Dep. at 97:5–10 & 126:8–12 (docket no. 38-3 at 45 & 57). Crews simply thought the

9  vaccine posed a safety risk because it was new and just developed. Crews Dep. at 96:15–

10  97:4 (docket no. 38-3 at 44–45).

11        On August 12, 2021, Crews wrote in an email: "In regards to medical exemptions

12  for the vaccine mandate, I received a note from my OBGYN saying I'm pregnant and can

13  choose to delay the vaccine until after pregnancy. I'm hoping this is good enough for a

14  medical exemption from the mandate." Ex. C to Davis Decl. (docket no. 39-3 at 12). At

15  her deposition, Crews agreed that an accurate statement was that she chose to delay

16  getting the vaccine until after her pregnancy. Crews Dep. at 97:17–20 (docket no. 38-3 at

17  45). On August 23, 2021, Davis informed Crews that the note from her OB/GYN was

18  insufficient to exempt or accommodate her due to her high-risk pregnancy; the

19  accommodation request needed to include reasoning from Crews's health care provider

20  as to why she cannot or should not have the vaccine at this time, rather than indicating

21  that Crews can "choose" to delay. Ex. C to Davis Decl. (docket no. 39-3 at 11). Crews

22

23

1    later informed Davis that *no* OB/GYN was willing to sign an exemption for Crews, so

2    she would not be submitting one.  Crews Dep. at 102:13–17 (docket no. 38-3 at 50).

3          In a Facebook post dated August 25, 2021, Crews commented, "I'm facing losing

4    my job due to this mandate because I'm not willing to get it while in a high risk

5    pregnancy.  No one cares that I'm willing to get it [in] January when I'm no longer

6    pregnant, and there's no one willing to stand up for people like me who have a genuine

7    medical concern about it right now."  Ex. E to Rogers Decl. (docket no. 38-5 at 2).

8          Crews then sought a religious exemption.  Crews Dep. at 102:15–17 & 109:14–17

9    (docket no. 38-3 at 50 & 54).  In her Religious Exemption Request Form, received by

10   DFI on September 9, 2021, Crews offered the following explanation for how a COVID-

11   19 vaccine conflicts with her asserted sincerely held religious beliefs:

12         In my religion, we base our decision off of prayer to God.  I have prayed over
          this decision since the vaccine was introduced to the public and I have felt in

13         my heart the answer to my prayer, and that is to avoid the vaccine while
          pregnant and while my two babies are counting on my body for survival.

14         God has put it in my heart that He made my body with an immune system to
          fight off diseases and viruses.  I will not put something in my body that can

15         affect how my God given immune system protects me.

16   Ex. D to Davis Decl. (docket no. 39-4 at 2).  According to Crews, God had "put it on

17   [her] heart to avoid this vaccine to keep [herself] and [her] unborn children safe."  <u>Id.</u>

18   (docket no. 39-4 at 3).  Crews indicated that she had held these religious beliefs since she

19   "was old enough to understand who God is and how to pray to him [her]self."  <u>Id.</u> (docket

20   no. 39-4 at 2).  As a child attending church, Crews was taught that all prayers are

21   answered and God is "our decision maker and our lives and hearts will be fulfilled if we

22   listen to him."  <u>Id.</u>  In her exemption request form, Crews also wrote that "God puts in

23

1  our hearts his answer", and "[i]f we pray over a medical decision, we feel His answer."

2  Id. (docket no. 39-4 at 2–3).  Failing to abide by God's answer and "what he has put in

3  our hearts" will lead God to "deny us as children of God."  Id. (docket no. 39-4 at 3).

4        At her deposition, Crews stated that "there was a lot of unknown factors that made

5  [her] uncomfortable" about getting a new vaccination and, she believed, risking a

6  miscarriage.  Crews Dep. at 92:5–10 & 102:18–103:4 (docket no. 38-3 at 41 & 50–51).

7  To deal with this discomfort, Crews "prayed a lot," and she later explained that "[i]t was

8  scary" to put anything into your body, "especially when you're pregnant."  Id. at 84:9–12

9  & 92:11–12 (docket no. 38-3 at 36 & 41).  As a result of her prayers, Crews "felt God

10  say, [']Don't do this.[']"  Id. at 84:13–14 (docket no. 38-3 at 36).  Crews has admitted

11  that she doesn't know why God told her not to get the vaccine; the reason could have

12  been that she was pregnant or that "it wasn't safe yet."  Id. at 93:18–25 (docket no. 38-3

13  at 42).  Crews has also conceded that she could get the vaccine after she gave birth.  Id. at

14  130:12–14 (docket no. 38-3 at 60) ("Q.  Okay.  And you were praying about it and

15  determined, yeah, that's okay after I'm pregnant?  A.  Correct."); id. at 132:8–11 (docket

16  no. 38-3 at 62) ("Q.  And you also publicly shared here that you would be willing to get

17  the vaccine when you were no longer pregnant, right?  A.  Correct."); see id. at 108:14–

18  17 (docket no. 38-3 at 53) ("I didn't feel like it was a, [']You can never do this.['] . . .  I

19  wasn't willing to my put children, my unborn kids at risk.").

20        Crews claimed that, even after she gave birth, the medical risk to her kids

21  remained because she was breast-feeding.  Id. at 108:21–25 (docket no. 38-3 at 53).

22  When asked whether her religious objection ceased after her kids "were no longer relying

23

on [her]," Crews responded, "I still relied on my immune system more." <u>Id.</u> at 109:1–4 (docket no. 38-3 at 54); <u>see</u> <u>id.</u> at 125:2–3 (docket no. 38-3 at 56) ("God gave me an immune system to fight this and I didn't need that."). Ultimately, Crews never received a COVID-19 vaccination. <u>Id.</u> at 83:1–16 (docket no. 38-3 at 35).

Crews's assertions are insufficient to establish a prima facie failure to accommodate claim under Title VII and the WLAD because she failed to assert a bona fide religious belief. Crews's predominant concern during her employment and pregnancy was the safety of her then-unborn children. The timing of Crews's religious exemption form submission and notice given to DFI supports this conclusion. Crews first sought a medical exemption to the COVID-19 vaccine mandate and failed to raise any religious objections to the vaccine until after Crews learned she would be unable to obtain a medical exemption. Ultimately, Crews told DFI that she would be willing to take the vaccine after her children were born. As explained in <u>Moore</u> and <u>Medrano</u>, beliefs about safety and personal medical judgments are not protected under Title VII or the WLAD. Additionally, Crews's explanation that she "feel[s] [God's] answer," Ex. D to Davis Decl. (docket no. 39-4 at 2–3), is akin to a refusal based on a divine directive, which the <u>Medrano</u> and <u>Ledezma</u> courts have explained amount to a "blanket privilege" that does not qualify as a bona fide religious belief. Finally, Crews's stated reliance on her immune system echoes the natural immunity arguments rejected in <u>Bartholomew</u> and <u>Jones</u>.

Accordingly, Crews's Title VII and WLAD claims are dismissed with prejudice.

/ / /

2.     __Plaintiff Bridgett Fisher's Claims__

In her Religious Exemption Request Form, Fisher explained she was baptized and raised in the Catholic Church, her religious faith is a fundamental part of her life, and she belongs to several churches in Seattle.  Ex. N of Davis Decl. (docket no. 39-14 at 4). Fisher described her objection to taking a COVID-19 vaccine as two-fold: (1) she has an immune system and does not need vaccines for respiratory illnesses, and (2) the COVID-19 vaccines use mRNA or DNA technology.  Id. (docket no. 39-14 at 4 & 6).

First, Fisher claims the Catholic Church teaches that she "may be required" to refuse a medical intervention, such as a vaccination, "if [her] informed conscience comes to this judgment."  Id. (docket no. 39-14 at 4).  When asked about the origin of that belief, Fisher replied that she "was created with an immune system and it will protect [her]."  Fisher Dep. at 98:3–13, Ex. A to Rogers Decl. (docket no. 38-1 at 38).  In her religious exemption request form, Fisher wrote that the COVID-19 vaccines "conflict with [her] religious beliefs because [she] oppose[s] vaccines that interfere with the function of the human immune system which God created."  Ex. N to Davis Decl. (docket no. 39-14 at 4).  Fisher further stated a belief that "it is a sin to try to make the body more perfect than its original creation by God, by taking a vaccine for something that the body was built to handle, such as airborne illnesses."  Id.  Fisher relied on 1 Corinthians 6:19-20, which she quoted as stating, "your body is a temple of the Holy Spirit within you." Id.  At her deposition, however, Fisher could not cite a section of the Bible that speaks to her belief about being created with an immune system that will protect her.  Fisher Dep. at 98:19–21 (docket no. 38-1 at 38).  Moreover, Fisher admitted that she had not had any

conversation with a pastor or priest about her immunity beliefs, and she was unaware of and could not identify any specific religious teachings that support her belief.  Id. at 98:22–99:2 (docket no. 38-1 at 38–39).  When asked how she determines the judgment of her informed conscience, Fisher responded, "I'm not sure."  Id. at 99:17–19 (docket no. 38-1 at 39).

Second, Fisher claims that her religious beliefs conflict with the COVID-19 vaccines because her beliefs prevent her "from taking any vaccines that are mRNA or DNA based."  Ex. N to Davis Decl. (docket no. 39-14 at 6).  In her religious exemption request form, Fisher stated that the mRNA technology vaccines, such as those from Moderna and Pfizer, "give genetic code instructions to cells in the body that do not originate from the DNA in the cell."  Id.  "Similarly, DNA based vaccines (such as the Johnson & Johnson ["J&J"] vaccine) deliver outside DNA to cells in the body."  Id. Fisher believes that her body "contains the DNA and genetic codes that God wanted it to contain" and "it is a sin to defile [her] body by introducing outside DNA or genetic code instructions into [her] body, as it goes against God's creation."  Id.  For support, Fisher quoted the following language from 1 Corinthians 3:17:  "if anyone destroys God's temple, God will destroy that person."  Id.

At her deposition, however, Fisher could not explain how she formed this belief, and she simply reiterated that she prefers to fight off any kind of airborne illness herself because she has "an immune system that [she] was created with."  Fisher Dep. at 100:4– 102:18 (docket no. 38-1 at 40–42).  When asked how the COVID-19 vaccine interferes with the function of the human immune system, Fisher replied, "Some kind of genetic

code that's coming in from outside my body where I already have all the DNA and genetic code that I need that I was created with." Id. at 100:4–9 (docket no. 38-1 at 40). Fisher also acknowledged that she was not an expert, a scientist, or a medical professional and that she had no interest in understanding how the COVID-19 vaccine operates. Id. at 100:14–19 & 101:4–9 (docket no. 38-1 at 40–41). Fisher testified that she looked for guidance from the Catholic Church in preparing her exemption request. Id. at 107:1–4 (docket no. 38-1 at 47). Nevertheless, she conceded that Catholicism does not require rejecting the vaccine. Id. at 107:5–21 (docket no. 38-1 at 47).

Fisher's assertions are insufficient to establish a prima facie failure to accommodate claim under Title VII and the WLAD because she failed to assert a bona fide religious belief. Similar to the plaintiff in Medrano, Fisher failed to cite to any specific religious belief that prohibited her from allegedly changing the way God created her. Fisher's belief that taking a vaccine for an airborne illness "that the body was built to handle" is sinful constitutes merely an unprotected personal or medical belief being improperly couched as a religious one. Fisher's views, in tandem with her statements that her body is a temple, fall under the category of natural immunity arguments that the Ledezma, Bartholomew, and Jones courts rejected. Fisher's objections to the mRNA vaccines are also personal medical judgments, and not religious, in nature, as explained in Medrano and Moore.

Accordingly, Fisher's Title VII and WLAD claims are dismissed with prejudice.

/ / /

/ / /

1

### 3.    Plaintiff Brigitte Norton's Claims

2  Norton has been a Jehovah's Witness since birth.  Norton Dep. at 107:22–108:2 &

3  108:11–13, Ex. D. to Rogers Decl. (docket no. 38-4 at 39–40).  She attended church

4  regularly as a child, but no longer does so.  Id. at 108:21–24 (docket no. 38-4 at 40).  In

5  her vaccination exemption request form, Norton objected to the mRNA COVID-19

6  vaccines (Pfizer and Moderna) because "mRNA gene therapy specifically works to

7  change the human body by manipulating its RNA coding."  Ex. P to Davis Decl. (docket

8  no. 39-16 at 3).  Norton asserted that such alteration "goes against [her] religious belief

9  that [her] body is a temple of God and [she did] not want to jeopardize or alter his

10  temple."  Id.  Additionally, Norton explained that receiving the Pfizer and Moderna

11  vaccines would violate her "religious belief that we should not try to change species."  Id.

12  During her deposition, Norton referred to her "understanding of the scriptures,"

13  and when asked which scriptures she had reviewed, Norton cited "Corinthians . . . 13,

14  14," which she interpreted as meaning that "[o]ur bodies are our temples from God - - or

15  God created our bodies, and in the eyes of God - - you know, it's just how close we are.

16  And I just - - the altering of that and whatnot, so . . . .  I don't want to change what God

17  has given me."  Norton Dep. at 111:7–20 (docket no. 38-4 at 41).  She confirmed that she

18  did not consult with anyone in reaching her decision because it was a personal decision

19  "between [her] and God."  Id. at 125:15–20 (docket no. 38-4 at 42).  Norton also

20  indicated that she would have been willing to take either the Pfizer or Moderna vaccine if

21  they were "traditional" vaccines (like for measles or mumps) without mRNA gene

22  therapy.  See id. at 128:11–23 (docket no. 38-4 at 45).

23

1    Norton also objected to the J&J COVID-19 vaccine because it "uses cloned

2    aborted fetal cell lines."  Ex. P to Davis Decl. (docket no. 39-16 at 3).  Norton reasoned

3    that, "[a]ccording to the bible, life begins at conception and is a gift from God.  It is

4    considered murder if someone kills an unborn child.  Therefore, my religious beliefs

5    forbade me from using" the J&J vaccine.  Id.  During her deposition, Norton

6    acknowledged that she would have been willing to have the J&J vaccine if it did not

7    contain fetal cells and "acted as a traditional vaccine."  Norton Dep. at 129:10–16 (docket

8    no. 38-4 at 46).  She also agreed that her concerns about the risks to women under 50

9    were safety related, and not religious in nature.  Id. at 129:19–23 (docket no. 38-4 at 46).

10    Norton's assertions are insufficient to establish a prima facie failure to

11    accommodate claim under Title VII and the WLAD because she failed to assert a bona

12    fide religious belief.  As to her objections to the mRNA COVID-19 vaccines, Norton's

13    beliefs about her body being a temple are insufficient as explained in Ledezma.  Absent

14    any evidence, Norton formed a belief that the Pfizer and Moderna vaccines change one's

15    genetic makeup.  Norton's secular conviction runs contrary to generally accepted

16    scientific principles that are not subject to reasonable dispute.  See Lynch Decl. at ¶ 4

17    (docket no. 44).

18    John B. Lynch, M.D., a board-certified infectious-disease physician, a professor at

19    the University of Washington School of Medicine, and an Associate Medical Director for

20    Harborview Medical Center, who prepared an expert report for DFI, Ex. A to Lynch

21    Decl. (docket no. 44-1), has indicated that "mRNA does not have the ability to alter

22    DNA."  Lynch Decl. at ¶ 4 (docket no. 44).  Dr. Lynch has explained that "infections in

23

humans occur through the introduction of the pathogen, including its RNA or DNA genome, into the host.  Viral pathogens specifically co-opt the host cell machinery to make more viral proteins and viral RNA or DNA.  Vaccines can prevent and/or mediate this process using a variety of technologies to deliver viral and bacterial antigens to humans to build immune responses that are available when that person is exposed to the pathogen."  Id. at ¶ 9.  The mRNA COVID-19 vaccines use the same theory as the vaccines for measles, mumps, rubella, chickenpox, and other diseases, i.e., stimulating a potential host's immune response by exposure to a weakened form of the pathogen, but mRNA vaccines do not use live attenuated viruses.  See id. at ¶¶ 7–9.

Norton has no objection, religious or otherwise, to "traditional" vaccines (in other words, vaccines that use live attenuated viruses, with viral RNA or DNA, like those for measles or mumps), and she has conceded that she would have been willing to receive the Pfizer or Moderna, but for her misunderstanding concerning how the vaccines operate.  Simply put, Norton's exemption request was based on misinformation that was scientific or medical, and not religious, in nature, as in Moore.  Because Norton could have requested the Pfizer or Moderna vaccine, any possible bona fide religious objections to the J&J vaccine are irrelevant.

Accordingly, Norton's Title VII and WLAD claims are dismissed with prejudice.

### 4.    **Plaintiff Carolyn Sabin's Claims**

On September 10, 2021, Sabin emailed Davis and Wright and attached a signed "Statement of Declination of COVID-19 Vaccine Product," as well as a letter from Liberty Counsel  that was sent to Governor Inslee and other Washington State officials

(the "Liberty Counsel Letter").  Ex. H to Davis Decl. (docket no. 39-8).  Sabin later

agreed that the Statement of Declination did not describe in any way her religious

convictions.  Sabin Dep. at 199:11–18, Ex. B to Rogers Decl. (docket no. 38-2 at 107).

She did not write either the Statement of Declination or the Liberty Counsel Letter.  Id. at

198:15–22 & 200:13–24 (docket no. 38-2 at 106 & 108).  Importantly, Sabin provided no

other explanation to DFI about her religious beliefs.  See id. at 200:13–24 (docket no. 38-

2 at 108).

        In her email, Sabin wrote, "I think it's important to know that I am not anti-

vaccines; just this one."  Ex. H to Davis Decl. (docket no. 39-8 at 2).  Sabin further stated

that she felt "so strongly against this vaccine" for the reasons outlined in the Liberty

Counsel Letter.  Id.  The Statement of Declination, which "[s]omebody shared . . . with"

Sabin, Sabin Dep. at 198:17–20 (docket no. 38-2 at 106), referenced unspecified "deeply-

held beliefs (creed) and religious convictions," and it "retain[ed] the right to decline all

attempts to access, influence and or otherwise alter my biological material and or

biological systems which are the craftsmanship of my Creator and of [sic] which my

Creator has granted me sole possession, proprietorship, and use of."  Ex. H to Davis Decl.

(docket no. 39-8 at 3).

        The Liberty Counsel Letter objected to Governor Inslee's Proclamation 21-14.1,

claiming it forced individuals in Washington to make "an unconscionable decision" to

"choose between the exercise of their sincerely held religious beliefs and feeding their

families."  Id. (docket no. 39-8 at 4–5).  The Liberty Counsel Letter argued as follows:

> It is now common knowledge and incontrovertible that all three of the
> currently available COVID-19 vaccines are produced by, derived from,

manufactured with, tested on, developed with, or otherwise connected to aborted fetal cell lines. . . .  Thus, the currently-available COVID shots are different than any vaccines an employee has taken in the past that were NOT derived using aborted fetal cells. . . .  While some people may hold sincere religious beliefs against taking ANY vaccines, many (indeed most) others only hold religious beliefs against accepting vaccines derived from aborted fetal cell lines used in testing, development, or manufacturing. . . .  [T]he [vaccination policy and its implementing f]orms thus are a frontal assault on millennia of Christian theology of "repentance" and turning from sin, as set forth in 1 Corinthian 6:9-11 . . . .

Id. (docket no. 39-8 at 6–7).

At her deposition, Sabin explained the nature of her religious objection to the COVID-19 vaccine as follows:  "I believe that the Holy Spirit guides me, and I never felt like it was a clear open door to go get the vaccine . . . .  I never felt cleared to go get the vaccine."  Sabin Dep. at 165:25–166:10, Ex. B to Rogers Decl. (docket no. 38-2 at 81–82).  Sabin indicated that she uses prayer to determine whether she is "cleared to do something."  Id. at 166:11–13 (docket no. 38-2 at 82).  If "it's too much" or "it just seems hard, then it's a no."  Id. at 166:13–14 (docket no. 38-2 at 82).  If she has to "agonize over a decision, then it's probably not the right decision for [her]."  Id. at 166:16–17 (docket no. 38-2 at 82).  Whether something is "a clear go" is communicated to her "inside" as a "peace" or "sense of calmness that comes over" her.  Id. at 166:23–167:1 (docket no. 38-2 at 82–83).  When asked if she could make decisions that are contrary to her feeling of calmness without violating her religious beliefs, Sabin replied that she "wouldn't call it a violation of [her] religious beliefs," but she just gets "a peace when [she] know[s] that that's what [she is] supposed to do."  Id. at 168:3–8 (docket no. 38-2 at 84).  If she had prayed on the COVID-19 vaccine and "was given a clear conscience from

the Holy Spirit," she "possibly" would have taken the COVID-19 vaccine.  Id. at 177:17–21 (docket no. 38-2 at 93).

Sabin's assertions are insufficient to establish a prima facie failure to accommodate claim under Title VII and the WLAD because she failed to assert a bona fide religious belief.  Like other Plaintiffs in this lawsuit, Sabin relies on her conscience and a "divine directive" as a basis to explain her religious beliefs.  The Court rejects Sabin's explanations for the same reasons stated by the Medrano court.  The Liberty Counsel Letter, which Sabin did not write, speaks about people's general objections to abortion and the use of fetal cells in the development of vaccines.  Additionally, that letter accused the vaccine *mandate* and religious exemption *forms* as being a "frontal assault on millennia of Christian theology of 'repentance,'" not the COVID-19 *vaccine* itself.  The only connection Sabin made between her personal reasons for opposing abortion and her religion was in her deposition, when she described a belief that "every human life has a God-given purpose and that God has a plan for that baby."  Sabin Dep. at 172:20–23 (docket no. 38-2 at 88).  This statement is conclusory, like the one in Jones, which the Court need not take at face value.  Sabin provides no further context as to her religious beliefs and, as in Medrano, has not articulated any specific religious doctrine that prohibited her from receiving a vaccine potentially produced through the use of fetal cell lines.[3]

---

[3] Loyd v. McKesson Corp., 2025 WL 563452 (D. Ariz. Feb. 20, 2025), a case on which Plaintiffs rely, is distinguishable.  In Loyd, one plaintiff attached a letter to his COVID-19 vaccination exemption request form describing his beliefs; he quoted several passages from the Bible, indicated his belief that abortion is murder, and asserted that the injection of vaccines developed or tested using "fetal stem cell lines from

1    Accordingly, Sabin's Title VII and WLAD claims are dismissed with prejudice.

2    **<u>Conclusion</u>**

3    For the foregoing reasons, the Court ORDERS:

4    (1)    Defendant Department of Financial Institutions' Motion for Summary

5    Judgment, docket no. 37, is GRANTED.  Plaintiffs' religious discrimination claims are

6    DISMISSED with prejudice.

7    (2)    The Clerk is directed to enter judgment, close this case, and send a copy of

8    this Order and the judgment to all counsel of record.

9    IT IS SO ORDERED.

10   Dated this 19th day of May, 2025.

11

12

13   Thomas S. Zilly
     United States District Judge

14

15

16

17

18

19   _____

20   aborted babies" would go against his religious beliefs.  <u>Id.</u> at *5.  He later testified consistently with these beliefs.  <u>Id.</u>  The <u>Loyd</u> court concluded that the defendant had asked the court to weigh evidence and make impermissible credibility determinations and that the alleged conflict between the plaintiff's initial

21   accommodation requests and later deposition testimony did not prove, as a matter of law, that the plaintiff's religious beliefs were insincere.  <u>Id.</u> at *6.  Instead, the issues that the defendant raised were

22   properly for the trier of fact.  <u>Id.</u>  Here, DFI's arguments as to Sabin's beliefs about abortions do not involve any conflicts between Sabin's submissions at the time she requested an exemption and her later deposition testimony.  Rather, DFI contends and the Court concludes that Sabin's stated beliefs are

23   conclusory.  <u>See</u> <u>Jones</u>, 2024 WL 3226748, at *5.

ORDER - 24